UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JESUS F.,                                )
                                         )
                    Plaintiff,           )
                                         )
            v.                           )        No. 1:18-cv-01072-DLP-TWP
                                         )
ANDREW M. SAUL, Commissioner of the      )
Social Security Administration,          )
                                         )
                    Defendant.           )

<u>**ORDER**</u>

Plaintiff Jesus F.[1] seeks judicial review of the denial by the Commissioner of

the Social Security Administration ("Commissioner") of his application for Social

Security Disability Insurance Benefits ("DIB") under Title II and for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42

U.S.C. §§ 423(d), 405(g). For the reasons set forth below, this Court hereby

**REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this

matter for further consideration.

## I.    PROCEDURAL HISTORY

On June 10, 2008, Jesus filed his initial application for Title II and Title XVI

applications for a period of disability and disability insurance benefits. [Dkt. 29 at

156-157 (R. 157-58).] On February 14, 2011, the Social Security Administration

---

[1] The Southern District of Indiana has adopted the recommendations put forth by the Court
Administration and Case Management Committee regarding the practice of using only the first
name and last initial of any non-government parties in Social Security opinions. The Undersigned
has elected to implement that practice in this Order.

("SSA") issued a preliminary determination that Jesus was not eligible for SSI benefits because of his monthly income of $1,200. [Dkt. 29 at 169 (R. 170).]

On March 1, 2011, Jesus filed a second application for Title II Disability Insurance Benefits ("Second Application). [Dkt. 29 at 159-160 (R. 160-61).] On March 1, 2011, the SSA again issued a preliminary determination stating Jesus was not eligible for SSI benefits based on his monthly income of $1,200. [Dkt. 29 at 166 (R. 167).] On April 12, 2011, Jesus received a letter denying his application for Title II benefits because his physical impairments did not prevent him from working. [Dkt. 29-1 at 1-3 (R. 174-76).] Jesus did not request reconsideration of this decision.

On July 20, 2012, Jesus filed a third application for Title II disability insurance benefits and for Title XVI SSI benefits, collectively ("Third Application"). [Dkt. 29-1 at 4-13 (R. 177-186).] On September 27, 2012, the SSA denied Jesus's application for Title XVI SSI benefits based on income. [Dkt. 29-1 at 62 (R. 230).] On November 28, 2012, Jesus filed a request for reconsideration of his Third Application because he believed the SSA had incorrect information regarding his monthly income. [Dkt. 29-1 at 75 (R. 243).] On January 16, 2013, the SSA found that their initial decision denying Title XVI SSI benefits was correct. [Dkt. 29-1 at 82-84 (R. 250-52).] On March 8, 2013, Jesus filed a request for a hearing before an Administrative Law Judge. [Dkt. 29-1 at 94 (R. 262).] On July 11, 2013, Plaintiff's counsel submitted a letter to the SSA requesting to reopen Jesus's Second Application regarding his Title II application. [Dkt. 29-1 at 101-102 (R. 269-270).] On July 16, 2013, the SSA sent a letter to Jesus's counsel stating that he was

medically denied for Title II benefits in his Third Application, and all subsequent Title II applications would be automatic technical denials based on *res judicata*. [Dkt. 29-1 at 135 (R. 303).] Moreover, the SSA concluded that "[a] new medical decision will never be made for Title II." [Id.]

On September 30, 2014, Jesus filed an application for Title II and Title XVI benefits with the SSA, and again requested reopening and consolidation of prior claims ("Fourth Application"). [Dkt. 29-1 at 142, 173 (R. 310, 336).]

On June 6, 2016, ALJ Albert J. Velasquez conducted a hearing, where Jesus testified. The ALJ determined that a supplemental hearing was necessary, where medical experts would be required to appear and testify. [Dkt. 29-11 at 50-51 (R. 1976-77).] The ALJ also gave Plaintiff's counsel an opportunity to provide a brief on why the ALJ should reopen and consolidate the previous cases, why no medical determination had been made previously, and the effect of Plaintiff's personal injury settlement. [Id.] On September 16, 2016, the ALJ conducted a supplemental hearing, where Jesus, vocational expert Dewey Franklin, and medical expert Dr. James Wargel testified.

On May 1, 2017, ALJ Velasquez issued a partially favorable decision finding that Jesus was disabled as of January 7, 2016 for purposes of SSI on his Fourth Application. [Dkt. 29 at 30 (R. 30).] The ALJ stated that he would not reopen Jesus's initial application for Title II and Title XVI benefits filed on May 30, 2008, nor would he reopen the Second Application requesting Title II benefits, filed on March 1, 2011. [Id.] In assessing Jesus's Title II claim in the Fourth Application, the ALJ found that Jesus was not disabled through the date last insured of

December 31, 2010. [Id.] On February 6, 2018, the Appeals Council issued an order denying Plaintiff's Request for Review of the ALJ's decision. Jesus now requests judicial review of the Commissioner's decision. *See* 42 U.S.C. § 1383(c)(3).

## II.   STANDARD OF REVIEW

To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520. The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [him] unable to perform [his] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at

4

steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520. The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant—in light of his age, education, job experience and residual functional capacity to work—is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

The Court reviews the Commissioner's denial of benefits to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Jesus is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

In this substantial-evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the

Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues, *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d at 872.

### III. Background

#### A. Factual Background

Jesus was 44 years old as of his date last insured in December 2010 and is 53 now. [Dkt. 29-1 at 20 (R. 189).] He obtained his General Educational Development ("GED") certification. [Dkt. 29-11 at 32-33 (R. 1958-959).] He has past relevant work history as a forklift driver, tree trimmer, roofer, construction laborer, and materials handler. [Dkt. 29 at 27 (R. 27).]

### B. ALJ Decision

In determining whether Jesus qualified for benefits under the Act, the ALJ went through the five-step analysis required by 20 C.F.R. § 404.1520(a). At step one, the ALJ found that Jesus was insured through December 31, 2010 and had not been engaged in substantial gainful activity since his alleged onset date of disability. [Dkt. 29 at 22 (R. 22).] At step two, the ALJ found that Jesus had severe impairments of degenerative disc disease of the lumbar spine, general anxiety disorder, and adjustment disorder and nonsevere impairments of a history of substance abuse and bowel and bladder dysfunction. [Id.]

At step three, the ALJ considered Jesus's spinal disorder under Listing 1.04 and determined that Jesus did not meet or medically equal any listing. [Dkt. 29 at 22-23 (R. 22-23).] Next, the ALJ determined that since September 26, 2007[2], Jesus has had an RFC to perform a limited range of sedentary work, with the following requirements: lifting and carrying 10 pounds occasionally and 5 pounds frequently; could sit for 6 hours of the work day if permitted to alternate to a standing position for 1-2 minutes of each hour and stand/walk for 4 hours of the work day if no standing period exceeded 30 minutes; occasionally climb ramps and stairs; avoid work at unprotected heights, around dangerous moving machinery, or around open flames or large bodies of water; work should be able to be learned in 30 days or less by demonstrations and should not require more than superficial interaction with

---

[2] The ALJ incorrectly notes that the claimant's alleged onset date of disability is September 26, 2007. The claimant's Title II application lists an alleged onset date of disability of September 26, 2006. [Dkt. 29-1 at 143 (R. 311).]

the public and coworkers; work should have no requirement for production-like quotas; no requirement for frequent and rapid changes of work settings or type of work; and the work should not be performed where alcoholic beverages or prescription medications are manufactured, transported, sold, or consumed. [Dkt. 29 at 23-24 (R. 23-24).] As to mental limitations, the ALJ determined that Jesus had moderate limitations in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace; the ALJ determined that Jesus had mild limitations with adapting or managing himself. [Id.]

At step four, the ALJ then determined that Jesus could not perform his past work as a fork lift driver, tree trimmer, roofer, construction laborer, or small material handler. [Dkt. 29 at 27 (R. 27).] At step five, the ALJ determined that considering Jesus's age, education, work experience, and RFC, he could perform the job of dowel inspector. [Dkt. 29 at 28 (R. 28).] Accordingly, the ALJ determined that Jesus was not disabled.

## IV.    Analysis

Jesus asserts that substantial evidence fails to support the ALJ's determination that he was not disabled, but makes four general arguments. First, Jesus argues that the ALJ erred at Steps Two and Four of the sequential analysis by failing to identify and incorporate all of his medically determinable severe and nonsevere impairments. Secondly, he asserts that the ALJ failed to meet the burden at Step Five by not establishing the existence of a significant number of jobs in the

general economy that Jesus could perform. Third, Jesus argues that the ALJ erred in assigning great weight to the opinion of medical expert, Dr. Wargel. Fourth, Jesus asserts that the ALJ erred by refusing to reopen prior applications. The Court will address each challenge in turn.

## A. Residual Functional Capacity

First, the Plaintiff argues that the ALJ erred at Steps 2 and 4 of the five-step analysis by failing to consider all of his medically determinable impairments at Step 2 and by failing to include the limitations of any such impairments in his RFC at Step 4. [Dkt. 15 at 20.]

In response, the Defendant claims that the ALJ created a logical bridge between the evidence and his conclusions. [Dkt. 21 at 12.] Defendant further argues that the Plaintiff did not provide any persuasive record evidence, such as a physician opinion, that the Plaintiff experienced any additional physical or mental functional limitations not already accommodated by the ALJ in his RFC findings. [Id.]

Plaintiff notes in his reply that the Defendant does not refute either the contention that the ALJ failed to mention or discuss all of Plaintiff's medically determinable impairments or that the ALJ failed to discuss the impact of those impairments on the RFC. [Dkt. 27 at 4.] Plaintiff repeats his argument that the ALJ failed to consider all of his medically determinable impairments found in the record and in turn failed to provide accommodation for those impairments in the RFC. [Id.] Additionally, Plaintiff reiterates his argument that although the ALJ

found Jesus's bowel and bladder dysfunction to be a nonsevere impairment in step 2, the ALJ did not provide any functional limitations in the RFC (or provide any analysis at all as to why no such limitations were included). [Id.]

At Step 2 of the five-step analysis, the ALJ must evaluate whether the claimant in fact has an impairment[3] or combinations of impairment that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). If there are no medically determinable severe impairments, the claimant is not found to be disabled. 20 C.F.R. § 404.1520(a)(4)(ii). The burden is on the claimant to prove that the impairment is severe. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

When considering whether an impairment is severe, the ALJ is to consider whether the impairment significantly limits one's physical or mental ability to do basic work activities, such as walking, standing, sitting, pushing, pulling; use of judgment; or dealing with changes in a routine work setting. 20 C.F.R. § 404.1522. Impairments are found to be "not severe" when the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered. Social Security Ruling 85-28 (S.S.A. 1985).

If the ALJ finds that the claimant has one or more severe impairments, the ALJ will proceed to the remaining steps in the evaluation process, considering the "aggregate effect of [the] entire constellation of ailments-including those

---

[3] A claimant's medically determinable impairments must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1521.

impairments that in isolation are not severe. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003); s*ee also* 20 C.F.R. § 404.1523.

In this case, Jesus claimed on his Fourth Application for benefits that post-traumatic stress disorder, neuropathy in both legs with resulting gait difficulties, and panic disorder, among others, were impairments that prevented him from working. [Dkt. 29-1 at 146 (R. 178).] He continually testified to those impairments throughout the course of his treatment, both with the consultative examiners and at the June 2016 and September 2016 hearings with the ALJ. [Dkts. 29-8 at 28-30 (R. 1478-480); 29-11 at 17-18 (R. 1943-944).]

The Plaintiff identified fourteen medically determinable impairments with medical diagnoses throughout the record. [Dkt. 15 at 20.] A cursory review of the record confirmed the existence of those diagnosed impairments, none of which were mentioned by the ALJ. For instance, consultative examiner Dr. Greene concluded in 2014 that Jesus had post-traumatic stress disorder and panic disorder, both of which could be attributed to his September 2006 accident and had been steadily increasing in severity over the last eight years. [Dkt. 29-5 at 132 (R. 999).] Additionally, Jesus reported difficulties with neuropathy and gait disturbances, as early as February 2007 and as late as December 2014. [Dkts. 29-3 at 61-62 (R. 595-96); 29-6 at 53-55 (R. 1138-140).]

In *Blackburn v. Berryhill*, 2018 WL 6204115 (S.D. Ind. Mar. 15, 2018), the Court concluded:

"Blackburn posits that her eyelid fasciculations (twitching) could cause problems with her near and far visual acuity. However, she failed to allege a

visual impairment when making her benefits claim, did not alert the ALJ to the issue at her hearing, and failed to provide any evidence that the condition actually caused any visual limitations. Without any evidence that her eyelid fasciculations affected her RFC, any error in failing to note the condition in the RFC analysis was harmless."

This is not the case here. Jesus provided more than enough information to the ALJ that neuropathy and post-traumatic stress disorder were impairments that caused him limitations and should be considered during the five-step analysis. [Dkts. 29-5 at 131-32 (R. 998-99); 29-8 at 30, 107-108 (R. 1480, 1557-558); 29-9 at 76 (R. 1673).]

The ALJ's failure to consider these medically determinable impairments constitutes error. *Williams v. Berryhill*, 2017 WL 3062403, at *6 (N.D. Ind. June 21, 2018); *Giles v. Berryhill*, 1:17-cv-02339-SEB-MJD, 2018 WL 4863645, at *3-4 (S.D. Ind. June 28, 2018). Not only does the ALJ here fail to discuss whether these other alleged impairments are severe, the ALJ's opinion provides no discussion of these other impairments and their impact on the Plaintiff's RFC at all, an undertaking which constitutes clear error. If a claimant has established a medically determined impairment that could reasonably be expected to produce pain or limitations, the ALJ must consider those subjective complaints. *Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014). The ALJ must consider all medically determinable impairments when assessing a claimant's RFC. 20 C.F.R. § 404.1545(a)(2); *see also Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) ("As a general rule, . . . the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record.").

In addition to failing to consider all medically determinable impairments in his RFC analysis, the ALJ uses three pieces of information to conclude that Jesus's spinal condition was not disabling: the fact that he could commit crimes; a statement made by the claimant indicating that he was riding a bike, walking, and climbing stairs; and the consultative exam with Dr. Koerber where Jesus was neurologically intact, with 5/5 muscle strength, and able to ambulate around the room without an assistive device. [Dkt. 29-6 at 51-55 (R. 1136-140.]

The ALJ fails to engage in a proper credibility analysis in evaluating Jesus's complaints of pain. *Martinez v. Astrue,* 630 F.3d 693, 696 (7th Cir. 2011) (ALJs must explain which of the claimant's statements are not credible); *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) (noting that an ALJ erred in her "belief that complaints of pain, to be credible, must be confirmed by diagnostic tests.").

Although the ALJ points to some instances in the record to support his conclusion, the ALJ does not engage with any of the medical evidence that demonstrates Jesus's spinal condition to be disabling, such as the records from Plaintiff's subsequent medical appointments where he reports continued back pain and his testimony at both hearings where he reports difficulties with bending and twisting and continued problems with standing and walking for periods of time. [Dkt. 29-11 at 17-18 (R. 1943-944).] It is improper for an ALJ to only engage with evidence that supports his ultimate conclusion without confronting evidence that goes to support the Plaintiff's complaints of pain. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).

On this point, the ALJ failed to meet his burden to consider all medically determinable impairments in Step 2 of the analysis and then to consider all limitations from those impairments in Step 4 of the analysis. Accordingly, the Court remands the case on this issue.

### B. Jobs in the National Economy

Once the ALJ determined that Jesus could not perform his prior work, the burden shifted to the Commissioner to show that Jesus could engage in some other type of substantial gainful employment. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). At Step 5 of the five-step analysis, an ALJ must determine whether the person can do any other work that exists in the national or regional economy. See 20 C.F.R. § 404.1520(a)(4)(v), (e), (f). The Social Security Act defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 20 C.F.R. § 404.1566; 42 U.S.C. § 423(d)(2). "Neither the Act nor the Commissioner's regulations or rulings (so far as the Court has been advised) define the terms "region" or "several regions." *Schadenfroh v. Colvin*, No. 1:13-CV-00223-SEB, 2014 WL 1260123, at *11 (S.D. Ind. Mar. 27, 2014).

To this end, when a claimant for disability benefits cannot be found disabled based upon medical considerations alone, the Social Security Administration has established the Medical–Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), in order to assess a claimant's ability to engage in substantial gainful activity. *Lee v. Sullivan*, 988 F.2d 789, 792–93 (7th Cir. 1993).

An ALJ may use the grids to determine whether other jobs exist in the national or regional economy that a claimant can perform. The grids generally take account only of exertional impairments.[4] Thus, when a nonexertional impairment – such as depression, anxiety, or difficulty concentrating or remembering – substantially reduces the employment opportunities an individual can perform, use of the grids is inappropriate and the ALJ must consult a vocational expert to prove the claimant's employment opportunities are not significantly diminished. *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005); *see also* 20 C.F.R. § 404.1569a(c)(1).

The vocational expert is required to estimate the number of jobs the claimant with his impairments can do that exist in the local, regional, and national economy. If there is a large number of such jobs in any of these three areas, the claimant is not disabled and loses. *Browning v. Colvin*, 766 F.3d 702, 708 (7th Cir. 2014).

In this case, the ALJ, after eliciting testimony from the vocational expert, determined that Jesus could perform the job of dowel inspector. The ALJ found that that there are 60,000 jobs existing nationwide for dowel inspectors. [Dkt. 29 at 28 (R. 28).] This recitation misstates the vocational expert's testimony, who indicated at the September 2016 hearing that 14,000 dowel inspector positions existed nationally. [Dkt. 29-11 at 119 (R. 2045).] The ALJ provides no explanation for his misstatement of the vocational expert's testimony, but concludes based on the 60,000 nationwide job figure that a significant number of jobs exists for Jesus to perform, and thus he is not disabled. The deference for the ALJ's decision is

---

[4] Exertional impairments are those that affect the claimant's "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b).

lessened where the ALJ's findings contain errors of fact or logic. *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013).

Jesus first argues that the ALJ erred in his Step 5 analysis when determining the existence of a significant number of jobs in the national economy that Jesus could perform. [Dkt. 15 at 14.] Plaintiff further argues that notwithstanding the ALJ's presumably clerical error in noting that 60,000 national jobs exist, the ALJ's contention that there are a significant number of jobs is not supported by the record. [Dkt. 15 at 15.] Additionally, Plaintiff argues that the ALJ failed to meet his burden at Step 5 of the inquiry by failing to include local or regional numbers of jobs available. [Id.]

The Defendant responds that the ALJ's inadvertent misstatement regarding the number of jobs available is harmless error. [Dkt. 21 at 14.] Defendant supports his contention that the ALJ's error was harmless by citing a Seventh Circuit case that concluded 4,000 jobs to be significant. *See Liskowitz v. Astrue*, 559 F.3d 736, 742 (7th Cir. 2009). The Defendant, however, left out the context for *Liskowitz*: the Seventh Circuit determined 4,000 to be a significant number of jobs for the Milwaukee metropolitan area, not nationally. *Id. Liskowiz* cites to several other cases, all of which determined that 1,000—1,350 jobs in the local economy were significant. *See* 559 F.3d at 742 (citing cases).

Here, where it is the ALJ's determination of the existence of a significant number of jobs in the national economy that is the linchpin by which the SSA determines Jesus not to be disabled, the error cannot be considered harmless. *See*

*Villano v. Astrue*, 556 F.3d 558, 564 (7th Cir. 2009) (ALJ's conclusion that claimant could perform 15,400 jobs when VE had identified 1,549 jobs could not be considered harmless).

Plaintiff also argues that the vocational expert was required to introduce numbers of jobs in the local or regional economy, rather than only listing jobs in the national economy. The Defendant, relying on *Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015), argues that local and regional statistics do not necessarily need to be included if the nationwide number of jobs is significant. [Id. at 14-15.]

The Defendant cites *Alaura* for a particular quote: "Why local and state statistics are included is unclear, since if there is a significant number of jobs that the applicant for benefits can perform anywhere in the United States he is deemed not disabled . . . ." 797 F.3d at 507. The Defendant, however, does not provide any context to that quote: it is dicta, and the vocational expert in that case provided an estimate of 300,000 nationwide jobs. Undoubtedly, 300,000 jobs in the national economy is going to be a significant number; it is less settled in the Seventh Circuit whether 14,000 national jobs constitutes a significant number. *See Barrett v. Barnhart*, 368 F.3d 691 (7th Cir. 2004) (citing cases). If 14,000 is divided evenly among the 50 states, there would be 280 jobs per state, which is likely not a significant number; if that national number, however, is concentrated solely in Indiana or in several regions of the country, that would probably be a significant number. The vocational expert does not provide any additional numbers or context

by which to support her contention about the number of jobs existing in the economy that Jesus could perform.

One case has evaluated what "significant" means to the Seventh Circuit: *Schadenfroh v. Colvin*, No. 1:13-cv-00223-SEB-DKL, 2014 WL 1260123 (S.D. Ind. Mar. 27, 2014). In that case, the vocational expert testified that there were 242 jobs in Indiana and 16,424 jobs nationally for an usher and children's attendant. The Court ultimately concluded that there is no logical, principled standard by which to judge whether numbers of jobs are significant and that "courts are left with hunches that are constrained only by the numbers that are held significant in precedential decisions." *Id.* at *12. Because the Commissioner did not meet his burden at step 5 of presenting clear precedent on what constitutes significant, the Court found that 242 jobs in Indiana was not a significant number. *Id.*

The Court reaffirms its analysis in *Schadenfroh*: here, the Commissioner did not present any clear precedent on what constitutes a significant number of jobs. Because the vocational expert provided only national numbers—no "regional" numbers—and the Act and § 404.1566(a) clearly provide that the significance of job numbers shall be judged based on less than the national totals, the Commissioner did not meet his burden and the case must be remanded on this issue.

### C. Weight of Medical Expert Dr. Wargel's Opinion

The Plaintiff's third argument is that the ALJ improperly gave great weight to the opinion of testifying medical expert ("ME"), Dr. James Wargel. [Dkt. 15 at 18.] Plaintiff's argument centers on the ALJ's alleged failure to follow the Social

Security Administration's Hearings, Appeals, and Litigation Law Manual

("HALLEX") in assessing the testimony of Dr. Wargel. [Id. at 19.] While recognizing

that the HALLEX guidelines do not create enforceable rights, the Plaintiff

maintains that the ALJ's failure to follow these guidelines "calls into question

whether the ALJ's decision is supported by substantial evidence." [Id.] Pursuant to

HALLEX I-2-6-70(B):

> "All ME testimony must be on the record. After administering the
> oath or affirmation, the ALJ must: 1) Ask the ME to confirm his or
> her impartiality, expertise, and professional qualifications; 2) verify
> the ME has examined all medical and other relevant evidence of
> record; and 3) ask the claimant and the representative whether they
> have any objections to the ME testifying."

HALLEX I-2-6-70(B).

Here, the Plaintiff argues that the ALJ failed to confirm the impartiality of

the ME and failed to confirm which portions of the file the ME actually reviewed.

[Dkt. 15 at 18.] While the Plaintiff acknowledges that HALLEX provisions do not

create enforceable rights, he argues that the ALJ's decision to give great weight to

Dr. Wargel's opinion is not supported by substantial evidence if it cannot be

determined that Dr. Wargel actually reviewed the entirety of the medical record. [Id

at 19.]

The Defendant argues in response that the ALJ's failure to follow the

HALLEX was not an error; if it was error, that error was harmless. [Dkt. 21 at 11.]

Defendant notes that the ALJ confirmed that Dr. Wargel received the claimant's

paper file and that, upon cross-examination, Dr. Wargel confirmed that while he did

not hear the Plaintiff' testimony at the hearing, he based his opinion on the record

evidence. [Id.] Furthermore, because there is no indication that the ME was not impartial, Defendant argues, there was no error in the ALJ giving great weight to ME Wargel's medical opinion. [Id.]

The Seventh Circuit has not directly addressed the issue of whether the HALLEX creates an individual right for claimants; the district courts, however, have held that "because the instructions in the HALLEX have not been formally promulgated as rules or regulations, they are not legally enforceable by claimants against the Commissioner." *Mitchell v. Berryhill*, No. 17 C 6241, 2019 WL 426149, at n.7 (N.D. Ill. Feb. 4, 2019) (citing *Jessee v. Berryhill*, No. 1:16-cv-3188-SEB-MJD, 2018 WL 797393, at *4 (S.D. Ind. Feb. 9, 2018) (citing cases). Thus, an ALJ's failure to follow instructions in the HALLEX does not show reversible error. *Jessee v. Berryhill*, 2018 WL 797393, at *4.

A violation of the HALLEX instructions does not, on its own, constitute a reversible error. However, other portions of Plaintiff's allegation separate from an ability to follow the HALLEX instructions might.

In this case, the ALJ gives great weight to Dr. Wargel's medical opinion regarding Plaintiff's psychological impairments for the following reasons:

> He has an applicable medical specialtie [sic]: Dr. Wargel is a Board Clinical Psychologist. He has a specialized knowledge of the Social Security disability program and lengthy experience serving as independent, objective, neutral and impartial medical expert evaluating Social Security disability cases. He personally reviewed the entire medical record including the most up to date medical exhibits and offered a thorough analysis of the medical evidence pertinent to his medical expertise. He offered an insightful and persuasive explanation in support of his medical opinion. Lastly, his medical opinion [sic] are consistent with the record as a whole.

[Dkt. 29 at 26 (R. 26).]

The weight an ALJ gives to medical opinions is guided by the factors described in 20 C.F.R. § 404.1527(c). If the ALJ determines that no medical opinion in the record deserves controlling weight, as happened in this case, the ALJ must consider every opinion in the record according to those factors, which include whether the physician: examined the claimant; treated the claimant frequently or for an extended period of time; specialized in treating the claimant's condition; performed appropriate diagnostic tests; or offered opinions consistent with the objective medical evidence and the record as a whole. 20 C.F.R. § 404.1527(c).

Here, the ALJ ultimately gave great weight to Dr. Wargel because he, according to the ALJ, was a board-certified psychologist, had a specialized knowledge of social security disability programs, reviewed the entire record, provided an impartial opinion, and his opinion was consistent with the record as a whole.

As stated previously, the ALJ must build an accurate and logical bridge between the evidence and his conclusion, and may not cherry-pick only the evidence that supports his conclusion. *Cooper v. Berryhill*, 244 F. Supp. 3d 824, 831 (S.D. Ind. 2017) (citing *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). Here, Dr. Wargel testified that if an employee had panic attacks, he would need breaks or time off task to handle those symptoms on his own. Even though Dr. Wargel indicated that there was not a significant reference to panic attacks in the record, Jesus testified that he still experienced panic attacks a few times per week. [Dkt. 29-11 at 114-14

21

(R. 2040-41).] Because Dr. Wargel was not present for Jesus's testimony at the hearing, it was imperative for the ALJ to have updated the ME regarding Jesus's earlier testimony. Moreover, Jesus's testimony regarding his panic attacks was provided to the consultative examiner in June 2014, and included in the record. [Dkt. 29-5 at 126, 130 (R. 993, 997).] The ALJ does not mention panic attacks at any point in his opinion. It appears the ALJ took Dr. Wargel's conclusions verbatim without any regard for other symptoms or impairments found in the record or in Jesus's testimony.

Jesus testified at the hearing that he still experienced considerable anxiety, an assertion supported by his treatment notes and the June 2014 consultative examiner's conclusion. Dr. Greene, the consultative examiner, concluded that as a direct result of his 2006 accident, Jesus:

> "suffers from PTSD, primarily repetitive nightmares re-living the accident all night every night, interrupting his sleep and causing chronic exhaustion. He suffers from Panic, which occurs without known triggers, and which may be due to a pervasive feeling of being vulnerable and unable to defend or care for himself. He has been developing increasingly severe Social Anxiety based on the actual fact that people stare at him due to his gait problems."

[Dkt. 29-5 at 132 (R. 999).] Dr. Wargel, however, indicated that anxiety was not really an issue for Jesus anymore. [Dkt. 29-11 at 113 (R. 2039).] As mentioned previously, the ALJ did not provide even a cursory medical history for Jesus, so just as it was impossible to determine what medical records the ALJ was relying on in determining which of Jesus's conditions were medically determinable impairments and which needed to be included in Jesus's RFC analysis, it is similarly impossible

to determine how the ALJ concluded that Dr. Wargel's medical opinion was consistent with the record.

As to the other regulatory factors, the ALJ only seems to have considered whether Dr. Wargel has an appropriate specialty. He does, in that he is a clinical psychologist. But the ALJ credits Dr. Wargel's opinion, who never examined Jesus or listened to his testimony at the hearing, above all other physicians in the record who actually evaluated Jesus in person (who were also clinical psychologists) and even above those who treated Jesus on an on-going basis. [Dkt. 29 at 26-27 (R. 26-27).] It is not enough for the ALJ to include a conclusory statement that Dr. Wargel's medical opinion is consistent with the medical record and to only engage with evidence that supports that conclusion – the ALJ must show his work. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012). While the ALJ need not specifically address every piece of evidence in the record to present the requisite "logical bridge" from the evidence to his conclusions, the ALJ must at least provide a glimpse into the reasoning behind his analysis and the decision to deny benefits. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *see also Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). In summary, because some of the guiding regulatory factors suggest Dr. Wargel's medical expert opinion may deserve less weight and because there are wide gaps in the ALJ's analysis of the great weight given to Dr. Wargel's opinion, the Court is unable to find substantial evidence supporting the Commissioner's decision.

### D. Reopening Prior Applications

Plaintiff's final argument is that the ALJ erred in his refusal to reopen his Second and Third applications, even though he had shown good cause for why those applications should be reopened. [Dkt. 15 at 25-32.] The Defendant argues that the ALJ's decision not to reopen a previous claim is not judicially reviewable. [Dkt. 21 at 7.] A brief recap of the procedural history of this matter is necessary before proceeding to discussion of the parties' arguments.

On March 1, 2011, Jesus filed his Second Application for Title II benefits where he alleged an onset date of September 26, 2006. [Dkt. 29 at 159-60 (R. 160-61).] In a letter dated March 1, 2011, the SSA determined that Jesus was not eligible for Title XVI SSI benefits because he was receiving an annuity of $1,200 per months. [Dkt. 29 at 166 (R. 167).] On April 12, 2011, a Notice of Disapproved Claim was issued as to Jesus's Title II claim, concluding that Jesus was not entitled to benefits because his physical impairments, specifically his spinal condition, were not disabling. [Dkt. 29-1 at 1-3 (R. 174-76).] On July 11, 2013, Plaintiff requested reopening of the Second Application for good cause shown. [Dkt. 29-1 at 101-102 (R. 269-70).]

On July 20, 2012, Jesus filed a third application for Title II disability insurance benefits and for Title XVI SSI benefits, collectively ("Third Application"). [Dkt. 29-1 at 4-13 (R. 177-186).] On September 27, 2012, Plaintiff received a notice of denial of claim that indicated he was ineligible to receive SSI because he received too much income. [Dkt. 29-1 at 62 (R. 230).] On November 28, 2012, Jesus timely

filed a request for reconsideration for both his Title II and Title XVI claims. [Dkt. 29-1 at 75 (R. 243).] On January 16, 2013, Plaintiff received a technical denial of his Title XVI claim because he received too much income. [Dkt. 29-1 at 82-84 (R. 250-52).] On March 8, 2013, Jesus filed a request for hearing before an administrative law judge, because he believed that his Third Application was still pending. [Dkt. 29-1 at 94 (R. 262).] On March 11, 2013, Plaintiff's counsel spoke with a representative in the Crawfordsville, Indiana Social Security Local Office, who confirmed that Jesus's Title II claim was barred due to *res judicata* because his physical impairment had previously been denied on April 12, 2011. [Dkt. 29-3 at 8 (R. 542).]

On July 11, 2013, Plaintiff requested reopening of the Title II claim of his Second Application. [Dkt. 29-1 at 101-02 (R. 269-70).] Plaintiff indicated that pursuant to 20 C.F.R. § 404.988, good cause, in the form of new and material evidence, existed that would permit his previous claims to be reopened. [Id.] Additionally, Plaintiff requested confirmation that his Title XVI claim of the Third Application was currently pending and would be set for a hearing, based on his request for a hearing filed on March 8, 2013. [Id.] On July 16, 2013, the SSA sent a letter indicating that Jesus's Title II claim from the Third Application was automatically denied because he had been medically denied for Title II benefits on April 12, 2011 and that all claims after that date would be denied on the basis of *res judicata* and that "a new medical decision will never be made for Title II." [Dkt. 29-1

25

at 135 (R. 303).] Jesus's Title XVI claim of the Third Application was not addressed in this letter.

On July 18, 2013, Plaintiff's counsel sent another letter to the SSA, noting that the July 16th letter was non-responsive to two questions: 1) whether the request to reopen the Second Application pursuant to 20 C.F.R. § 404.988 had been denied; and 2) the status of Plaintiff's Title XVI claim of the Third Application file-marked September 19, 2012 with a protective filing date of July 20, 2012. [Dkt. 29-1 at 137 (R. 305).] Counsel did not receive a response to this letter. [Dkt. 29-3 at 9 (R. 543).]

Plaintiff protectively filed for Title II and Title XVI benefits in his Fourth Application on September 30, 2014. [Dkt. 29-1 at 142, 173 (R. 310, 336).] Plaintiff filed the Fourth Application because his Title XVI claim in the Third Application was never set for hearing and he was never informed if his request to reopen the Title II claim from the Second Application was approved. [Dkt. 29-3 at 9 (R. 543).] In addition to the Fourth Application, Jesus filed another request to reopen the Title II claim of the Second Application and he also filed a request to consolidate the Third and Fourth applications. These requests were reiterated at the June 2016 hearing. [Dkts. 29-3 at 6-15 (R. 540-549); 29-11 at 20 (R. 1946); 29-1 at 138-40 (R. 306-08).] In his opinion issued on May 1, 2017, ALJ Velasquez denied Plaintiff's requests to reopen his First and Second Applications, but did not address the Third Application. [Dkt. 29 at 19 (R. 19).]

Plaintiff argues that the ALJ erred by refusing to reopen the Title II claim of his Second Application, which was denied on April 12, 2011, even though he had submitted new and material evidence. [Dkt. 15 at 25-32.] Additionally, Plaintiff argues that the Title XVI claim from Plaintiff's Third Application was not set for a hearing, despite a timely request for hearing being filed. [Id.] Alternatively, Plaintiff argues that the ALJ constructively reopened his First, Second, and Third Applications, despite an express refusal to reopen them, by reconsidering the prior claims on the merits. [Id. at 32.]

Defendant responds that the ALJ's refusal to reopen Jesus's prior applications is not reviewable by the district court. [Dkt. 21 at 7.] While the Defendant admits that the April 12, 2011 denial only encompassed the physical impairment of Jesus's spinal condition and did not consider any mental impairments, the Defendant maintains that this does not make the ALJ's refusal to reopen judicially reviewable. Additionally, Defendant argues that the ALJ's recognition of Jesus's alleged onset date, with the conclusion that he had severe impairments and an RFC since that date, does not constitute a constructive reopening of prior claims. [Id.]

a. *Legal Standard*

The Social Security Act contains no provision for the reopening of closed proceedings, but the Social Security Administration has promulgated a regulation that permits such reopening under certain conditions. 20 C.F.R. §§ 404.987-989. The Plaintiff only argues the second condition, which indicates that a final

determination can be reopened within four years for "good cause," which can only be established by (1) furnishing new and material evidence, (2) demonstrating a clerical error, or (3) offering evidence in the record that "clearly shows on its face that an error was made." 20 C.F.R. §§ 404.988(b), 404.989(a).

A decision not to reopen a previous determination or a decision to apply administrative *res judicata* is a discretionary decision and typically not within the district court's jurisdiction.[5] *Johnson v. Sullivan*, 936 F.2d 974, 976 (7th Cir. 1991). There are two instances where a district court nevertheless may review a decision not to reopen a previous determination. First, a district court can review a decision not to reopen a proceeding in "those rare instances where the Secretary's denial of a petition to reopen is challenged on constitutional grounds." *Califano v. Sanders*, 430 U.S. 99, 109 (1977). Second, if the ALJ applies *res judicata* in concluding that a previous determination should not be reopened, a district court may review the decision to determine if *res judicata* was applied properly. *McGee v. Bowen*, 647 F.Supp. 1238, 1244-45 (N.D. Ill. 1986); *Krizan v. Apfel*, 35 F. Supp. 2d 672, 675 (N.D. Ind. 1999).

Other Courts in this Circuit have concluded that a district court may also review a decision not to reopen if the ALJ nonetheless reconsidered an otherwise final determination "on the merits to any extent and at any administrative level," *see McLachlan v. Astrue*, 703 F. Supp. 2d, 791, 795 (N.D. Ill. 2010) (citing *Johnson v. Sullivan*, 936 F.2d 974 (7th Cir. 1991)), but the Seventh Circuit's stance on this

---

[5] District courts have jurisdiction to review final decisions of the SSA made after a hearing. 42 U.S.C. § 405(g).

issue is unclear. *See Clara P. v. Saul*, No. 1:18-cv-04029-TWP-TAB, 2019 WL 5537222 (S.D. Ind. Oct. 24, 2019).

    *b. Title II Claim from Second Application*

    As mentioned previously, the SSA originally denied Jesus's Title II claim of the Second Application because his "back and walking problems due to 37-foot fall" did not prevent him from performing work. [Dkt. 29-1 at 3 (R. 176).] On July 11, 2013, Plaintiff requested reopening of the Title II claim of his Second Application. [Dkt. 29-1 at 101-02 (R. 269-70).] On July 16, 2013, the SSA sent the Plaintiff a letter denying his Title II claim from the Third Application based on *res judicata*, stating that "[a]ll subsequent applications at any level will be technical denials. A new medical decision will never be made for Title II." [Dkt. 29-1 at 135 (R. 303).] The letter did not address, however, the Plaintiff's request to reopen the Second Application.

    The parties contest whether the ALJ's refusal to reopen the SSA's denial of the Second Application for Title II benefits for physical impairments is judicially reviewable. The Court notes that the Plaintiff followed the proper procedure to request that his Title II claim of the Second Application be reopened. Within four years of the date of notice of the initial determination, the Plaintiff requested to reopen his application arguing good cause. Although the SSA never provided a formal response approving or denying Jesus's multiple requests to reopen his Title II claim of the Second Application, those requests to reopen were properly before the ALJ when he issued his decision on Jesus's Fourth Application on May 1, 2017.

The ALJ addressed the topic of reopening in his opinion:

> The claimant filed prior applications on May 30, 2008 (Title II & Title XVI) and March 1, 2011 (Title II) but I find no reason/no good cause/no fraud or other reason necessary to reopen the prior decision/determination dated February 24, 2010/April 12, 2011. Pursuant to 20 C.F.R. 404.988(a)/(b)/(c) and 416.1488(a)/(b)/(c)/, I specifically decline to do so. . . . Though claimant's counsel has repeated [sic] sought reopening of prior applications, as stated above, I saw no obligation to do so.

[Dkt. 29 at 19, 25 (R. 19, 25).]

As discussed, there are two instances where a decision not to reopen becomes judicially reviewable: when the claimant challenges that decision on constitutional grounds and when the district court must verify whether the SSA applied *res judicata* properly. Here, the Plaintiff does not challenge the ALJ's decision not to reopen on constitutional grounds. Additionally, the ALJ does not invoke the application of *res judicata* anywhere in his application. Instead, the ALJ clearly indicates that his discretionary decision not to reopen Jesus's prior claim is based on the Plaintiff's failure to demonstrate good cause. Accordingly, the ALJ's decision not to reopen Jesus's Title II claim of the Second Application is not judicially reviewable.

### c. *Title XVI Claim from the Third Application*

As mentioned previously, the SSA denied Jesus's Title XVI claim from the Third Application initially on September 27, 2012 and on reconsideration on November 28, 2012 because they concluded that Jesus had too much monthly income. The Plaintiff requested that the ALJ reopen the Title XVI claim from the Third Application because he had timely filed a Request for Hearing on March 8,

30

2013 without ever receiving a response. [Dkt. 29-1 at 94 (R. 262).] The ALJ does not address this issue in his decision, nor does the Commissioner respond to the Plaintiff's argument in his briefing. Thus, the Court cannot make a determination based on the record at hand. This case is already being remanded on other issues, therefore the Undersigned requests that the SSA evaluate Plaintiff's March 8, 2013 Request for Hearing on the Title XVI claim of the Third Application on remand.

### d. Constructive Reopening

Plaintiff argues in the alternative that even if the ALJ's express decision refusing to reopen his Title II claim of the Second Application is not reviewable by this Court, the ALJ's opinion constructively reopened that previous claim and rendered it judicially reviewable. [Dkt. 15 at 32.] The Defendant responds that the ALJ's recognition of Plaintiff's onset date, and the fact that he had severe impairments and a residual functional capacity since that date, does not constitute a constructive reopening of previous claims. [Dkt. 21 at 8.]

Some Courts in this Circuit have determined that ALJs can constructively reopen prior claims if the ALJ makes a determination on the merits by considering the same evidence for the same time period previously adjudicated by the SSA. *McGee v. Bowen*, 647 F. Supp. 1238, 1245 (N.D. Ill 1986); *Ritchie v. Berryhill*, 1:15-cv-299-TLS, 2017 WL 3947541 (N.D. Ind. Sept. 8, 2017). This Court has considered the issue, and come out on both sides. *See Rucker v. Shalala*, 894 F.Supp. 1209 (S.D. Ind. 1995); *Garber v. Berryhill*, No. 1:16-cv-3221-JMS-MJD, 2017 WL 5889720 (S.D. Ind. Nov. 29, 2017). But, the concept of constructive reopening has only been

acknowledged, not adopted by the Seventh Circuit. *See Garber*, 2017 WL 5889720, at *6; *Clara P.*, 2019 WL 5537222, at *5. Plaintiff cites to no Seventh Circuit precedent that outlines whether and to what extent constructive reopening of a prior claim may occur. Accordingly, the Court declines to conclude that a constructive reopening occurred here.

### E. ALJ's Language

On a final note, the Court finds it important to mention that the hearing transcripts and ALJ opinion contain multiple questionable references and conclusions. At the June 2016 hearing, it was noted that the Plaintiff had received $25,000 in a workers' compensation payment for his injury sustained in falling off a roof in 2006. The ALJ asked: "What happens to that money? You just blew it all up your nose or what? Buy a new truck?" [Dkt. 29-11 at 43 (R. 1963).] Jesus responded that he paid bills and bought himself a coat. [Id.] Then, in the ALJ's May 1, 2017 decision, the ALJ notes: "Indeed, not to be glib, but the claimant has been able to engage in domestic violence on a number of occasions and armed robbery that resulted in incarcerations. Clearly, he was able to rise above his level of pain while engaging in these activities." [Dkt. 29 at 25 (R. 25).]

The ALJ provides no context for any of these comments or observations. An ALJ's decision cannot be affirmed if it lacks evidentiary support or an inadequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Jesus's physicians, however, addressed these issues directly, concluding that Jesus's criminal history "in no way negates or minimizes [the claimant's] profound

32

psychological suffering and significant losses that are attributable to the accident of September 25, 2006." [Dkt. 29-5 at 131 (R. 998).] According to his medical records, Jesus was incredibly active prior to the accident, engaging in competitive martial arts and working out consistently, but after the accident he began to experience severe anxiety and panic attacks, in large part to the dramatic decline in his psychosocial functioning after the accident. [Dkt. 29-5 at 131-32 (R. 998-99).] The medical professional found that Jesus's chronic medical conditions and pre-existing addictive personality made him vulnerable to opioid addiction, which seems to explain his desire to use controlled substances. [Id. at 132 (999).] Moreover, a medical expert noted that because Jesus lacked medical insurance for many years, he was unable to receive any psychological treatment or gain access to a pain management clinic that would be able to treat him without narcotics. [Id. at 132 (999).] While this does not negate the criminal activity that Jesus engaged in, it does provide the Court with the necessary context to evaluate his claims.

Finally, the Court would like to highlight an exchange from the September 2016 hearing that is particularly illuminating for this case:

ALJ: And that was a Dr. Shaw that was giving you some medications. Right?
Jesus: A who?
ALJ: Shaw – Dr. Shaw?
Jesus: I don't recall Dr. Shaw.
ALJ: I thought it was S-H-A-W. I just saw one doctor didn't want to talk about the psych meds.
Attorney: Where's that at?

ALJ: I don't know. It all runs together after a while. I do about six of these a day, and they just kind of run together.

[Dkt. 29-11 at 97 (R. 2023).]

While this Court is no stranger to a packed calendar – in fact, the Southern District of Indiana has the highest weighted filings for the Seventh Circuit, and the third highest weighted filings for the entire nation – it must remain vigilant to the fair and effective administration of justice. A busy schedule does not justify inattention to obligation.

## V.     Conclusion

For the reasons detailed herein, this court **REVERSES** the ALJ's decision denying Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four) as detailed above. Final judgment will issue accordingly.

So ORDERED.


Date: 12/16/2019

_Doris L. Pryor_
Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana




Distribution:

All ECF-registered counsel of record.